## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

BRUMAN STALIN ALVAREZ, #257-455    *

Plaintiff    *

v    *         Civil Action No. PX-17-141

MARYLAND DEPARMENT OF    *
  CORRECTIONS, et al.[1]
DAVID BLUMBERG, *Maryland*    *
  *Commissioner of Corrections, in his official*
  *capacities,*    *
GREGG L. HERSHBERGER, *in his individual*
  *and official capacities or actions under color*    *
  *of law as Commissioner of Correction for*
  *the Northern Region,*    *
SCOTT OAKLEY, *in his individual and*
  *and official capacities for actions under*    *
  *color of law as Executive Director of the*
  *Maryland Department of Corrections*,    *
ROBIN WOOLFORD, *in his individual and*
  *official capacities for actions under color*    *
  *law as Deputy Director of Division of*
  *Corrections,*    *
RICHARD J. GRAHAM, *in his individual*
  *and official capacities for actions under*    *
  *color of law as Warden of Western*
  *Correctional Institution, Cumberland*,    *
DENISE GELSINGER, *in her individual*
  *and official capacities for actions under*    *
  *color of law as Assistant Warden at*
  *Western Correctional Institution,*    *
SHARON BAUCOM, M.D.*, in her*
  *individual and official capacities for*    *
  *actions under color of law MD DOC*
  *Director of Clinical Services,*    *
SERGEANT L. LASHER, CO III, *in her*
  *individual and official capacities for a*    *
  *actions under color of law as Correctional*
  *Officer, Western Correctional Institution,*    *
  *Cumberland,*
WEXFORD HEALTH SOURCES, INC.,    *

---

[1] The Clerk will amend the docket to reflect the correct names of Defendants.

ASRESAHEGN GETACHEW, M.D., *in his*
  *individual and official capacities for actions*
*under color of law as Medical Director,*      *
*Wexford Health Sources, Inc.,*
ROBUSTIANO BARRERA, M.D., *In his*            *
  *individual and official capacities for actions*
  *under color of law as Plaintiff's treating*    *
  *physician Western Correctional*
  *Institution, Cumberland,*                      *
JANICE GILMORE, *Medical Supervisor,*
  *in her individual and official capacities*      *
  *for actions under color of law as Medical*
  *Staff, Western Correctional Institution,*       *
  *Cumberland,*
DAYENA CORCORAN, *Commissioner*               *
  *of Corrections,*
                                                  *

Defendants

                              ***

# MEMORANDUM OPINION

Bruman Stalin Alvarez is an inmate at Western Correctional Institution (WCI) and in the

Custody of the Maryland Department of Public Safety and Correctional Services (DPSCS).

Pending before the Court is Alvarez's Complaint pursuant to 42 U.S.C. § 1983, which raises

Eighth Amendment claims arising from Alvarez' asserted lack of adequate medical care, as well

as violations of the Equal Protection clause of the Fourteenth Amendment, Title II of the

Americans with Disabilities Act ("ADA") as amended, and § 504 of the Rehabilitation Act of

1973. Alvarez also brings state common law claims for medical malpractice.

Defendants Wexford Health Sources, Inc., Asresahegn Getachew, M.D., Robustiano

Barrera, M.D., and Janice Gilmore[2] (collectively, "the Medical Defendants") have filed a Motion

to Dismiss, or Alternatively, a Motion for Summary Judgment. ECF No. 17.  The Maryland

Division of Correction (DOC), David Blumberg, Chairman of the Maryland Parole Commission,

---

[2]  The Court takes judicial notice that Ms. Gilmore died since this case was filed.  *See Williamson v. Graham, et al.*,
Civil Action No. GLR-1915 , ECF No. 31 (Suggestion of Death).  Counsel has not moved for Gilmore's dismissal
from this case.

Gregg L. Hershberger, former Commissioner of Correction for the Northern Region, Robin Woolford, Deputy Director of the Inmate Grievance Office (IGO), Richard J. Graham, Warden at the Western Correctional Institution (WCI), Denise Gelsinger, former Assistant Warden of WCI, Sgt. Lisa L. Lasher, WCI, and Sharon Baucom, M.D., Director of Clinical Services for the Maryland DOC (collectively, "the State Defendants") also have filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. ECF No. 24. Alvarez has filed an opposition (ECF No. 30) to which the Medical Defendants replied. ECF No 33. Alvarez filed a Surreply. ECF No. 34.

Also under review are Alvarez's Motion for Leave to File an Amended Complaint (ECF No. 31), Commissioner of Correction Dayena Corcoran's Motion to join the State Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 37), and Alvarez's recently filed Motion for a Preliminary Injunction and Temporary Restraining Order. ECF No. 39. In his Motion for Leave to File an Amended Complaint, Alvarez asks to substitute Dayena Corcoran, Commissioner of Correction, in place of David Blumberg. ECF No. 31; *see also* Alvarez Opp. ECF No. 30 n.1 (stating Alvarez filed a Motion to Voluntarily Dismiss Blumberg, an apparent reference to the intent expressed in the Motion for Leave to File an Amended Complaint). The Court grants his request. Dayena Corcoran is added as a defendant and David Blumberg will be dismissed from this case. Corcoran's Motion to Join the State Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 37), is granted. Alvarez's Motion for a Preliminary Injunction and Temporary Restraining Order will is denied for the reasons discussed in this Memorandum Opinion.

The matter is briefed and the Court finds a hearing unnecessary at this time. Local Rule 105.6 (D. Md. 2016). For the reasons stated below, Defendants' Motions to Dismiss or in the Alternative Summary Judgement are GRANTED in part and DENIED in part.

## BACKGROUND

At the heart of Alvarez's forty-seven page Complaint is his longstanding osteoarthritis in his right knee arising from Medical Defendants' alleged failure to treat his meniscus tear. Compl. ECF No. 1 at 2. Accordingly, the Court considers Alvarez's medical records documenting his treatment during his incarceration and to which Alvarez raises no objection.

On March 27, 2014, Alvarez, an inmate at Jessup Correctional Institution (JCI) at that time, underwent outpatient surgery on his right knee at Bon Secours Hospital. Compl. ECF No. 1 at 8 ¶ 4, Med. Def. Ex. ECF No. 17-2 at 19, 27. Alvarez was seen at JCI by John Moss, PA, on April 2, 2014, for post-surgical follow-up. Moss noted that Alvarez was "doing well with no pain" but had some continued back pain. Med. Def. Ex. ECF No. 17-2 at 10.

Alvarez was then seen in the orthopedic clinic at Bon Secours Hospital on May 20, 2014 and July 29, 2014. Med. Def. Ex ECF No. 17-2 at 13, 15; Pl. Ex. ECF No. 1-3. During the July 29, 2014, medical visit, Alvarez was diagnosed with arthritis in his right knee. ECF No. 17-2 at 13, 15; Pl. Ex. ECF No. 1-3 Alvarez maintains that Dr. Ashok Krishnaswamy[3] diagnosed him post-surgically as physically disabled and recommended an MRI and a cane for him. Compl. ECF No. 1 at 8 ¶ 4; Pl. Ex. ECF Nos. 1-3 (medical records). Krishnaswamy also recommended placing Alvarez in a cell with handrails. Compl. ECF No. 1 at 8 ¶ 4; Pl. Ex. ECF No. 1-3 (medical records). Alvarez claims that post-surgical physical therapy orders were not followed,

---

[3] Ashok Krishnaswamy M.D., is an orthopedic physician on the staff at Bon Secours Hospital in Baltimore, Maryland. *See* https://bonsecours.com/baltimore/find-a-provider/providers#sort=relevancy&f:specialty= [Orthopedic%20Surgery]&f:provider-type-facet=[Physician] (last visited February 21, 2018).

and approximately seven weeks after the surgery, he "continued to complain" of his right knee "popping out of place, locking, and giving out." Compl. ECF No. 1 at 8 ¶ 4.

On August 1, 2014, John Moss, PA, saw Alvarez, noting that the orthopedist at Bon Secours recommended physical therapy for Alvarez's right knee. Med Def. Ex. ECF No. 17-2 at 21. Moss gave Alvarez an elastic knee brace and a submitted a consultation for physical therapy. Med Def. Ex. ECF No. 17-2 at 15, 16, 21. On August 12, 2014, Moss wrote an addendum to the medical record which indicated that, upon Alvarez's upon return to JCI from the Orthopedic Clinic on July 29, 2014, he was told that his housing in did not include any cells with rails. Med Def. Ex. ECF No. 17-2 at 17. Moss told Alvarez that he would be placed in housing with handrails after he finished his time in segregation. Med Def. Ex. ECF No. 17-2 at 17.

On September 15, 2014, Dr. Robustiano Barerra noted in connection with Alvarez's transfer from JCI to WCI the following regarding Alvarez's medical status:

> He comes in walking with a can[e]. Gave a history of surgery to the left knee miniscus [sic]. He is wearing an unloader brace on the left leg. He complains of right knee pain as well and was about to have an MRI of the right knee but he was moved to this institution prior to the MRI being done. Patient will be rescheduled for the MRI. The right knee gives out and causes the patient to fall. He cannot tolerate NSAID because of his history of GI bleeding.

Med. Def. Ex. ECF No. 17-2 at 23.

Alvarez states that an October 10, 2014, an MRI of his right knee revealed a "bucket-handle tear to the multidirectional medial and radial meniscus with degenerative chrondromalasia of the right knee." Compl. ECF No. 1 at 8 ¶ 5; *see also* Med Def. Ex. ECF No. 17-2 at 25. Alvarez asserts that Dr. Krishaswamy, Dr. Roy J. Carls,[4] and Dr. Barrera "strongly recommended" that arthroscopic surgery be performed "soon." Compl. ECF No. 1 at 8 ¶ 5; Pl. Ex. ECF Nos. 1-3 at 3 (medical record). Alvarez claims that since September of 2014, Dr.

---

[4]     Roy J. Carls, M.D. is an orthopedic surgeon on the staff at Western Maryland Health System (WMHS). *See* https://www.wmhs.com/orthopedic-surgery-team.html (last visited February 21, 2018).

Krisnaswamy and Dr. Carls have recommended meniscus repair surgery for him on four occasions based on the MRI. Compl. ECF No. 1 at 13 ¶ 48, at 14-15 ¶¶ 51- 54.

On October 16, 2014, Dr. Barrera met with Alvarez to advise that Alvarez would receive a medical consultation with Dr. Carls, although Alvarez' medical notes for the same date indicates that Alvarez was referred to Dr. Krishnaswamy. Med Def. Ex. ECF No. 17-2 at 25, 27. Barrera also noted that he would review Alvarez' medical chart to evaluate Alverez's request for a cell with handicap accommodations. Med Def. Ex. ECF No. 17-2 at 25. On October 22, 2014, Barrera approved Alvarez for a grab bar near the commode because his knee "is very unstable." Med Def. Ex. ECF No. 17-2 at 28.

On November 20, 2014, Barrera made the following observations as to Alverez's ongoing knee problems:

> Patient had an orthroscopic [sic] surgery at BSH [Bon Secours Hospital] and was unsuccessful. A repeat MRI was done on 10-10-14 at WMHS [Western Maryland Health System] and showed [h]orizontal tear, non-displaced, posterior horn, medial miniscus [sic], and a radial tear lateral miniscus [sic] with some degenerative changes. Patient was advised of the findings and he reports that his knee (right) still pops out of place and gives him severe pain. Knee brace is not helping. He saw Dr. [K]rishnaswamy and advised him that he needs another surgery. Patient prefers to be done by WMHS doctor. I will place a consult base [sic] on this.

Med Def. Ex. ECF No. 17-2 at 29.

Despite Barrera's clear recommendation that a second surgery be performed on Alvarez' knee, Alvarez avers that in April of 2015, Dr. Getechew denied him arthroscopic surgery "because it cost too much money" and recommended physical therapy and a knee brace instead. Compl. ECF No. 1 at 15 ¶ 53. Notably, the Medical Defendants marshal no evidence to the contrary. Alvarez also asserts that Dr. Getachew told him on August 25, 2015 that "surgeons like to chop-up people like me and charge lots of money; he recommended PT [physical therapy]

and a custom made brace." Compl. ECF No. 1 at 15 ¶ 55. Alvarez's medical records document Alvarez' telemedicine consultation with Dr. Getachew as follows:

> Patient was presented to Dr. Getachew for ruptured miniscus [sic]. Dr. Getachew explained in detail the pros and cons of orthoscopic surgery. He suggest[e]d to do physical therapy to strengthen the [q]uadricep muscles and to request for [sic] a knee stabilizer. The patient understood all Dr. Getachew's explanation and agreed with the suggesti[ion]. Will do consult for PT and knee stabilizer.

Med. Def. Ex. ECF No. 17-2 at 31.

On April 30, 2015, Alvarez met with Stephen D. Ryan for a physical therapy evaluation. Med. Def. Ex. ECF No. 17-2 at 32. Ryan reported that Alvarez walked with a cane and his gait was "mildly antalgic but stable." Ryan listed the goals of physical therapy to include extension of the left knee, increasing strength in the "quads," and establishing a self-management program for Alvarez. Med. Def. Ex. ECF No. 17-2 at 32. On May 12, 2015, Alvarez had one physical therapy session. Med. Def. Ex. ECF No. 17-2 at 33.

On June 5, 2015, Dr. Barrera reported that Alvarez was presented "to consultant via telemed and recom[m]ended knee brace and physical therapy." Med. Def. Ex. ECF No. 17-2 at 34. Barrera noted that neither the knee brace nor physical therapy was helping Alvarez who continued to walk with a cane and a limp. "Pain is not presently controlled with the present dose of gabapentin. He cannot use NSAID since it caused GI bleeding." Med. Def. Ex. ECF No. 17-2 at 34. Barrera also renewed Alvarez's prescription for Gabapentin 800 mg. to be taken twice daily and add Tylenol with codeine to be taken when necessary. Med. Def. Ex. ECF No. 17-2 at 34.

On the same day, June 5, 2015, Dr. Carls saw Alvarez for an orthopedic consultation for right knee pain and recommended arthroscopic surgery for him. Carls noted Alvarez had multi-

directional instability and a meniscus tear. Med. Def. Ex. ECF No. 17-2 at 36. Dr. Carls' report reads in pertinent part:

> ASSESSMENT: Right knee giving way symptoms with evidence of medial and lateral meniscus tears. Even though he had had a prior arthroscopy he is still having significant mechanical symptoms and there is evidence to suggest medial and lateral recurrent meniscus tears.
>
> PLAN: Since he has not gotten better with any other non-surgical approach the recommendation is a revision right knee arthroscopy. In the meantime I strongly recommend to Bruman that he continue to work on quadriceps strengthening exercises to get his knee as strong as possible. He should also continue using his knee brace with can be very helpful. He understands the risks and benefits associated with surgery and he desires to proceed. When this is approved this can be done at Western Maryland Health System [WMHS] as an outpatient procedure.

Med. Def. Ex. ECF No. 17-2 at 37.

On June 24, 2015, Alvarez underwent preoperative testing for a July 1, 2015, scheduled surgery with Dr. Carls. Med. Def. Ex. ECF No. 17-2 at 38. On June 25, 2015, Dr. Barrera saw Alvarez for complaints of back pain. Med. Def. Ex. ECF No. 17-2 at 39. Barrera entered the following notes on the medical chart:

> Patient has chronic back pain compatible with deg. disc disease at the level L%=S1 [sic]. His pain however was controlled until the Neurontin was not approved. His back pain recurred and although he is approved for knee surgeryn[sic] the patient would like to wait until he resolves his back pain. I will therefore refer him back to Dr. Carls. His radicular pain shoots to his left toe.
>
> Patient gives a history of GI bleeding from using NSAID, currently however, bec. His Neurontin was not approved, he is using his ibeuprofen sparingly for pain. I will request Neurontin again.

Med. Def. Ex. ECF No. 17-2 at 39.

Alvarez asserts that he once again asked for the knee surgery after his back pain subsided. Alvarez Pl. Opp. ECF No. 31 at 11. Alvarez claims Dr. Barrera informed him that Dr. Getachew once again denied him the surgery. *Id.*

8

On August 25, 2015, Alvarez's knee problem was again presented to Dr. Getachew during a telemedicine conference. Medical notes from the conference document that Alvarez' "knee dislocates depending on the way he walks." Getachew recommended a knee brace and physical therapy for Alvarez. Med. Def. Ex. ECF No. 17-2 at 41; *see also* State Def. Ex. ECF No. 17-2 at 69, 70 (knee orthosis prescribed on September 30, 2015 awaiting authorization). Alvarez claims Getachew refused to approve surgery for him because it was "costly to Wexford." Pl. Opp. ECF No. 31 at 11. When Getachew was informed that the surgery was already approved for June of 2015, he responded "June's approval was done in error." *Id.* Alvarez also informed Getachew that he had already been provided physical therapy and a knee brace and had showed no improvement. *Id.* Dr. Getachew said he was ordering a better brace this time. Alvarez states that he received a custom brace approximately one year later but it did not help him. *Id.* at 11-12.

Several months later, on December 17, 2015, Dr. Barrera saw Alvarez for complaints of back and knee pain. Barrera diagnosed Alvarez with degenerative disc disease and was prescribed 800 mg. of Neurontin to be taken twice daily. Further, Barrera also diagnosed degenerative knee disease, and noted that Alvarez walks with a cane, and was advised to use knee braces. Although Alvarez requested assignment to a properly outfitted cell to accommodate his unsteady gate, Barrera advised Alvarez to first try using a knee brace, the issuance of which was still pending approval. In addition, Barrera indicated that he would prescribe amitriptyline 10mg for Alvarez. Med. Def. Ex. ECF No. 17-2 at 42.

On September 9, 2016, Carla Buck, RN, saw Alvarez for his complaints of low back pain. Buck observed that Alvarez walked with a cane and a limp and referred him for pain

management.  Med. Def. Ex. ECF No. 17-2 at 43.  On December 13, 2016,[5] Alvarez' right knee

gave out, causing him to drop a cup of hot coffee on his right foot.  He claims he sustained third

degree burns on his foot.  Supp. Compl. ECF No. 6.

Dr. Carls saw Alvarez on February 23, 2017.  Dr. Carls' entry on the medical chart

includes the following:

> Broman [sic] is coming back today for his right knee.  He notes that he is feeling
> more of a "pop, pop, pop" whenever he moves the knee.  He feels very unstable
> with it.  He prefers to use a wheelchair for longer distances and uses a cane for
> shorter distances.  His left knee also gives him pain and he has had multiple
> surgeries on that in the past but he is specifically here for his right knee.

Med. Def. Ex. ECF No. 17-2 at 47.

Dr. Carls assessed Alvarez as "ACL deficient right knee."  Med. Def. Ex. ECF No. 17-2

at 47.  Carls recommended ordering an MRI and that Alvarez use a knee brace whenever he is

"up and around" because of "his history [of a] likely meniscus pathology as well as some early

arthritic changes in his knee as well." Med. Def. Ex. ECF No. 17-2 at 47.  Carls further

recommended that Alvarez continue his quadriceps exercises and see him after an MRI that was

scheduled.

The MRI was performed on April 10, 2017.  Med. Def. Ex. ECF No. 17-2 at 48.  The

MRI report notes in Alvarez's right knee "moderate osteoarthritis with a radial tear in the body

of the medial meniscus. Alternatively, this truncated appearance could be due to a previous

partial medial meniscectomy." Med. Def. Ex. ECF No. 17-2 at 48.

On June 16, 2017, Alvarez was approved "for ortho procedure."  State Def. Ex. ECF No.

17-2 at 48.  ECF 24-6 at 59, 62, 77.[6]  Alvarez corroborates via declaration that his surgery was

---

[5]  The record shows the date of the incident was December 11 or 12, 2016.  Supp. Comp. ECF No. 6 at 11; State
Defs. Ex. ECF No. 24-6 at 8.
[6]  The State Defendants include medical records not filed by the Medical Defendants.

performed on his right knee in "late 2017." Declaration of Bruman Alvarez, ECF No. 39-1 at 1 ¶ 3.

Alvarez's Complaint centers on his persistent pain and problems with walking as a result of his right knee. Alvarez more particularly argues that due to the delay in his knee surgery, he has suffered permanent knee damage and associated medical problems such as sciatic nerve injury to his lower back and hips, meniscus tears in his left knee, and osteoarthritis in both knees. Compl. ECF No. 1 at 8-9. Alvarez also asserts that the defendant medical doctors deliberately ignored the prevailing medical standards of care for treating meniscus tears and acted with deliberate indifference to his serious medical needs. Compl. ECF No. 1 at 14 ¶ 50. Drs. Getachew and Barrera, and Ms. Janice Gilmore, argues Alvarez, knew that arthroscopy surgery had been recommended by Dr. Krishaswamy in November of 2014 and Dr. Carls in January of 2015 and June of 2015, and refused to provide the surgery. Compl. ECF No. 1 at 18 ¶ 73.

Alvarez also faults the DOC and its agents and contractors for interfering, delaying, or denying him arthroscopic surgery by requiring non-formulary pain medicine treatment for his meniscus tear and withholding treatment until his symptoms of severe degenerative joint disease worsened. Compl. ECF No. 1 at 17 ¶47; at 19 ¶¶ 76-77. Alvarez more specifically asserts that DOC's policies against medically warranted arthroscopy surgery for meniscus tears violates his right to equal protection. Compl. ECF No. 1 at 17 ¶¶ 66-69.

Alvarez also asserts a variety of other failures on the part of DOC personnel. Alvarez faults Sgt. Lasher for denying him a properly equipped cell to accommodate his knee injury.[7]

---

[7] On February 17, 2015, Alvarez filed a grievance, ARP WCI 0281-15, alleging that Sgt. Lasher discriminated and retaliated against him by interfering with his medical treatment in that she moved him from a lower to a top tier. State Def. Ex. ECF No. 24-11. The ARP was dismissed at the institutional and headquarters levels after investigation. Alvarez was advised that custody staff have no authority over medical decisions. After a medical staff reassessed Alvarez, a medical order was issued to house him on a bottom tier bunk for three months. State Def. Ex. ECF No. 24-11 at 6.

Alvarez also asserts that Lasher and Gilmore collectively discontinued his feed-in status Alvarez claims on January 14, 2015 after he slipped and fell on ice, and despite medical orders requiring medical feed status for three months. Compl. ECF No. 1 at 44 ¶¶ 198 - 203.

As relief, Alvarez requests include immediate arthroscopic surgery on his right knee and a meniscus implant if such treatment accords with the AAOS/AAM/ NEJOM standard of care, and without first requiring him to manifest extreme degenerative disease. Alvarez also seeks punitive and compensatory damages, and other injunctive and declaratory relief. ECF No. 1 at 46 ¶¶ 1-13.

## STANDARD OF REVIEW

A motion to dismiss filed under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint. When evaluating a 12(b)(6) motion to dismiss, a plaintiff's well-pleaded allegations are accepted as true and the complaint is viewed in the light most favorable to the plaintiff. Accordingly, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.,* 637 F.3d 435, 440 (4th Cir. 2011); *see Hall v. DirectTV, LLC*, 846 F.3d 757, 765 (4th Cir. 2017).

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). A genuine issue of disputed material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). When considering a motion for summary

judgment, the Court must determine whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249.

In this analysis, a court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Libertarian Party of Va.*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007). A court "must not weigh evidence or make credibility determinations." *Foster v. University of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)). This Court must also not allow factually unsupported claims and defenses to go to trial. *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993). If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment must be granted. *Anderson*, 477 U.S. at 249-50. A party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also In re Apex Express Corp.,* 190 F.3d 624, 633 (4th Cir. 1999). As this Court has previously explained, a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted).

This Court is mindful that Alvarez is proceeding pro se. A federal court must liberally construe pro se pleadings to allow the development of potentially meritorious cases. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Cruz v. Beto*, 405 U.S. 319 (1972). Liberal construction does not mean, however, that this Court can ignore a clear failure in the pleadings to allege facts sufficient to state a claim. *See Weller v. Department of Social Services*, 901 F.2d 387, 391 (4th Cir. 1990). Put succinctly, a court cannot assume a genuine issue of material fact where none exists. Fed.R.Civ.P. 56(c).

**DISCUSSION**

I.      **Claims Against the Medical Defendants**

      **A.  Medical Negligence**

To the extent that Alvarez intends to raise claims based on alleged medical malpractice or negligence by Wexford providers, the claims cannot proceed at this stage. Alvarez must first file any such claims pursuant to the Maryland Health Care Malpractice Claims Act ("the Act"), Md. Code Ann., Cts. & Jud. Proc. § 3-2A-01, *et seq.,* which establishes the procedure for medical malpractice actions. Claims against a health provider for medical injury must be submitted to the Health Care Alternative Dispute Resolution Office as a condition precedent to any judicial action. *See id.* at § 3-2A-02; *see also Roberts v. Suburban Hosp. Assoc., Inc.,* 73 Md. App. 1, 3 (1987); *Davison v. Sinai Hosp. of Balt. Inc.,* 462 F. Supp. 778, 779-81 (D. Md. 1978), *aff'd*, 617 F.2d 361 (4th Cir. 1980).

When assessing whether a claim sounds in medical malpractice, a court is required to focus on "whether the claim is based on the rendering or failure to render health care and not on the label placed on the claim." *Brown v. Rabbit*, 300 Md. 171, 175 (1984). Noncompliance with the Act requires dismissal without prejudice to refile once the plaintiff has exhausted the Act's remedies. *See Roberts,* 73 Md. App. at 6; *see also Davison*, 462 F. Supp. at 781. Alvarez's claims, to the extent they are construed as claims of medical negligence or malpractice, are subject to the Act's requirements. Because Alvarez has failed to demonstrate that he complied with the Act's requirements, his state claims will be dismissed without prejudice. By separate order, the Court will appoint counsel to represent Mr. Alvarez who can explore compliance with the Act on Alvarez' behalf.

**B. Eighth Amendment Claims**

The Eighth Amendment of the United States Constitution prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003), citing *Wilson v. Setter*, 501 U.S. 294, 297 (1991). To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that defendants' acts or omissions amounted to deliberate indifference to his serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan,* 511 U.S. 825, 837 (1994).

A "serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko,* 535 F.3d at 241 (internal quotation marks and ellipses omitted). Proof of an objectively serious medical condition, however, does not end the inquiry. The subjective component requires "subjective recklessness" in the face of the serious medical condition. *Farmer,* 511 U.S. at 839-40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.' " *Brice v. Virginia*

*Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995), (quoting *Farmer*, 511 U.S. at 844).

If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk known to the defendant at the time. *Brown v. Harris,* 240 F. 3d 383, 390 (4th Cir. 2000); *see also Jackson v. Lightsey*, 775 F.3d 170, 179 (4th Cir. 2014). An inmate does not have a constitutional right treatment of choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986). Moreover, an inmate's disagreements with medical staff over the type or extent of medical treatment, standing alone, do not support a constitutional claim. *See Estelle*, 429 U.S. at 105-06; *Wright v. Collins,* 766 F.2d 841, 849 (4th Cir. 1985).

Further, "any negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones,* 145 F.3d 164, 166 (4th Cir. 1998).   In essence, the treatment rendered must be so grossly incompetent or inadequate as to shock the conscience or to be intolerable to fundamental fairness. *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citation omitted) (overruled in part on other grounds by *Farmer*, 511 U.S. at 837; aff'd in pertinent part by *Sharpe v. S.C. Dep't of Corr.*, 621 F. App'x 732 (Mem) (4th Cir. 2015)). Adequacy of treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977).

### 1. Claims against Dr. Getachew, Dr. Barrera, and Ms. Gilmore

The Medical Defendants' verified exhibits demonstrate, and Alvarez does not dispute, that Alvarez was evaluated by two orthopedists, Dr. Krishnaswamy and Dr. Carls, in 2014 and 2015, both of whom recommended knee surgery. Alvarez was scheduled for knee surgery but, on June 25, 2015, shortly before surgery was to take place, he decided to wait until his back pain resolved and thereafter he would be re-referred to Dr. Carls. Med Defs. Ex. ECF No. 17-2 at 41. However, nothing in the medical record suggests that any effort was made after that time to reschedule the surgery. Nor is there any indication that Alvarez's knee condition had changed so that the surgery was no longer needed. It is also plain from the record that Alvarez continued to complain of knee pain, and his concerns were known to Dr. Getachew and Barrera. Med Defs. Ex. ECF No. 17-2 at 39, 41, 42.

Moreover, Dr. Getachew does not contest that he characterized the approval of the June 2015 surgery as "an error." Dr. Getachew also prescribed a brace and physical therapy in lieu of surgery. However, once again, the record is bereft of any evidence that Alvarez received the brace or therapy, or whether either alternative ameliorated his knee problems. Certainly according to Barrera, previous attempts at using a brace and physical therapy did not help. Med Defs. Ex. ECF No. 17-2 at 34.

What is more, the medical record demonstrates Drs. Getachew and Barrera were actively involved in Alvarez' care, and had already participated in decisions to schedule knee surgery on July 1, 2015. *See e.g.* Med. Def. Ex. ECF No. 17-2 at 41, 42, 45-46. But then inexplicably, Alvarez waited approximately twenty months before he was seen again by Dr. Carls on February 23, 2017 to reschedule the surgery. Med. Def. Ex. ECF No. 17-2 at 48. Thus, Alvarez waited at least two years to have his surgery. These delays in the face of consensus that Alvarez needed

surgery in June of 2015, combined with his continued complaints of knee pain and conspicuous mobility problems, is sufficient to create a genuine issue of disputed fact that Defendants Getachew and Barrera were subjectively and objectively reckless in the face of Barrera's serious medical condition. Further, Getachew and Barrera's prolonged inaction despite actually knowing the severity of Alvarez longstanding knee problems, further presents a genuine issue of disputed fact as to whether they were deliberately indifferent to Alvarez's serious medical needs in violation of his Eighth Amendment rights. Summary judgment absent discovery is simply inappropriate as to Dr. Getachew or Dr. Barrera. The motion is denied.

As to Defendant Janice Gilmore, a nurse and medical administrator, Alvarez asserts that Gilmore denied him a cell that was equipped to provide him with handrails to accommodate medical needs.[8] Alvarez also claims that Gilmore cancelled his feed-in cell order at the request of a correctional officer, and he subsequently fell when walking to the dining hall. Sgt. Lisa Lasher's declaration (ECF No. 24-5) corroborates that Lasher asked Gilmore to cancel Alvarez's feed-in status, albeit according to Lasher after Alvarez was observed walking to the commissary. However, when evaluating Alvarez's allegations in the light most favorable to him, as this Court must at the summary judgment stage, genuine issues of material fact exist as to whether Gilmore acted with deliberate indifference to Alvarez's serious medical needs when she denied him an accessible cell with handrails. Summary judgment is accordingly denied as to claims against Gilmore.

### 2. Claims Against Wexford

Wexford, a private contractor that provides health care at correctional facilities, argues that dismissal of the claims against it is warranted because the doctrine of respondeat superior

---

[8] Sgt. Lisa Lasher explains in her declaration that the medical department assigns accessible cells designed to accommodate physical disabilities. Lasher Decl., State Def. Ex. ECF No. 24-5 ¶ 3.

does not apply to § 1983 claims. *See Love-Lane v. Martin,* 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983). Generally, § 1983 liability is not available solely upon a theory of respondeat superior. Wexford also seems to suggest that its status as a "corporate entity" providing services through their employees or agents" alone insulates it from liability Alvarez' constitutional claims. ECF No. 10, p. 16.

Although the Court agrees that Wexford cannot be held liable under a theory of respondeat superior, this does not mean that Wexford is forever beyond liability. A private corporation is liable under § 1983 "when an official policy or custom of the corporation causes the alleged deprivation of federal rights." *Austin v. Paramount Parks ,* 195 F.3d 715, 727-28 (4th Cir. 1999). Known as *Monell* liability, Wexford can be held responsible as a corporate entity stepping into the shoes of the municipality if "certain affirmative decisions of [Wexford's] individual policymaking officials, or in certain omissions on the part of policymaking officials that manifest deliberate indifference to the rights of citizens." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999); *See also Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658 (1978). Wexford's custom or practice may provide an alternate route to *Monell* liability "even though such a custom has not received formal approval through the body's official decision making channels," *Monell*, 436 U.S. at 690. *See also Powell v. Shopco Laurel Co*., 678 F.2d 504, 506 (4th Cir. 1982); *Clark v. Md. Dep't of Pub. Safety & Corr. Servs*., 316 F. App'x 279, 282 (4th Cir. 2009).

At this stage in the proceedings, Alvarez' § 1983 claim against Wexford survives. As a pro se litigant, the Court is obligated to construe liberally Alvarez' Complaint so that potentially meritorious claims proceed. The Complaint particularly alleges that Wexford contracted with Maryland Department of Corrections to provide medical treatment to inmates; that Wexford has

demonstrated deliberate indifference to the serious medical needs of Alvarez, and critically, that Wexford has implemented its unconstitutional policy or custom through its decisions of those in supervisory power who provided direct care to Alvarez. Alvarez notes specifically that Drs. Getachew as Medical Director for Wexford, and Baucom as Director of Clinical Services for DOC, hold supervisory positions in connection with the provision of DOC medical services.

It is undisputed that Dr. Getachew was directly involved in assessing Alvarez' medical needs. Alvarez further contends that Getachew worked in concert with Baucom and Barrera who both knew of Alvarez' need for knee surgery as recommended by at least two orthopedic surgeons. ECF No. 1.¶¶ 62, 73. Further, Alvarez avers that despite this actual knowledge, those officials determined without medical explanation, and in violation of the applicable medical standard of care, that Alvarez would not receive surgery.

Alvarez also pleads, perhaps in a less clear fashion, that the repeated denial of this surgery is consistent with the DOC/Wexford policy of providing less-than the medical standard of care for disorders of Alvarez' kind, all in the name of "cost saving" and "administrative convenience." *Id. ¶¶* 78-80. At this stage in the proceedings, and because the Court will appoint Alvarez counsel to pursue claims on his behalf, Alvarez will be given the opportunity to engage in discovery as to Wexford's potential *Monell* liability.

### 3. Qualified Immunity

The Medical Defendants raise qualified immunity as an affirmative defense. Med. Defs. Memorandum, ECF No. 17-1 at 8-9. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800,

818 (1982)). A defendant is not entitled to summary judgment on the basis of qualified immunity, however, if (1) a genuine issue of material fact exists regarding whether the government official violated one of the plaintiff's federally protected rights; and (2) the right at issue was "clearly established" at the time of the events in question. *See id*. at 232.

The defense of qualified immunity will not bar Alvarez' claims against the Medical Defendants. As discussed above, genuine issues of disputed fact exist as to whether the Medical Defendants violated Alvarez' Eighth Amendment right to be free from cruel and unusual punishment. Moreover, Alvarez' right at issue is clearly established. *Scinto v. Stansberry,* 841 U.S. 219, 236 (2016) ("A prisoner's right to adequate medical care and freedom from deliberate indifference to medical needs has been clearly established by the Supreme Court and this Circuit since at least 1976"). Accordingly, the Medical Defendants Motion to Dismiss or, in the Alternative, for Summary Judgment will be denied.

## II.     Claims Against the State Defendants

The State Defendants raise respondeat superior, Eleventh Amendment immunity, and qualified immunity as affirmative defenses. They also argue are entitled to dismissal of the claims against them or summary judgment in their favor because Alvarez fails to set forth sufficient facts to state a violation of constitutional or federal law. The Court addresses each in turn.

### A.  ADA and Rehabilitation Act Claims

Alvarez's cursory and conclusory references in the Complaint to the ADA and Rehabilitation Act are insufficient to state a claim. Simply referring to the statutes without some factual predicate establishing the State Defendants' liability under the same will not suffice. *See Constantine v. George Mason Univ*., 411 F.3d 474, 498 (4th Cir. 2005) (stating elements of

ADA and Rehabilitation Act claims); *Heiko v. Columbo Savings Bank, F.S.B.,* 434 F.3d 249, 254 (4th Cir. 2006) (outlining elements of an ADA claim).[9] Consequently, the ADA and Rehabilitation Act claims will be dismissed.

### B.  Equal Protection and Due Process Claims

The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 439 (1985).  To succeed on an equal protection claim, a petitioner "must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001); *see also Washington v. Davis*, 426 U.S. 229, 239-42 (1976); *Veney v. Wyche,* 293 F.3d 726, 730 (4th Cir. 2002). Alvarez asserts no facts to support an equal protection claim against the State Defendants.  More particularly, nowhere does he allege purposeful disparate treatment resulting from an impermissible discriminatory animus.  Accordingly, this claim will be dismissed.

### C.  Claims Against Defendants Baucom, Corcoran  Gelsinger, Graham, Hershberger

To establish liability under 42 U.S.C. § 1983, a plaintiff must show individual fault, whether based upon the defendant's own conduct or another's conduct in executing the defendant's policies or customs.  *See Monell*, 436 U.S. at 690; *West v. Atkins,* 815 F.2d 993, 996

---

[9] To the extent Alvarez brings his ADA claims against Defendants in their individual capacities, "the ADA does not authorize suit against individuals for violating its provisions." *King v. Schrader,* No. DKC No. 16-3804, 2017 WL 3730335, at *3 (D. Md. August 30, 2017); *Altevorgt v. Kirwan*, No. WDQ–11–1061, 2012 WL 135283, at *5 (D. Md. Jan. 13, 2012); *Jones v. Sternheimer,* 387 Fed. Appx. 366, 368 (4th Cir. 2010) ("Title VII, the ADA, and the ADEA ... do not provide for causes of action against defendants in their individual capacities."); *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 471-72 (4th Cir. 1999).  To the extent Alvarez seeks damages against the State Defendants in their official capacities, official-capacity claims are properly construed as "a suit against the official's office" and are "no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Maryland did not consent to suits under the ADA. *McCray v. Md. Dep't of Transp., Md. Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014).

(4th Cir. 1987), rev'd on other grounds, 487 U.S. 42 (1988) (no allegation of personal involvement relevant to the claimed deprivation); *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (for an individual defendant to be held liable pursuant to § 1983, it must be "affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights"), quoting *Bennett v. Gravelle*, 323 F. Supp. 203, 214 (D. Md. 1971, aff'd, 451 F.2d 1011 (4th Cir. 1971). Liability cannot be established based on a theory of respondeat superior. *See Love–Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). Rather, for § 1983 claims liability of supervisory officials "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.' " *Baynard v. Malone,* 268 F.3d 228, 235 (4th Cir. 2001), quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984).

Supervisory liability may attach under § 1983 if a plaintiff establishes: (1) "that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff"; (2) "that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) "that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir. 1994) (citations and internal quotation marks omitted).

Alvarez seeks to hold Defendants Baucom, Corcoran, Gelsinger, Graham, and Hershberger liable for violating his rights under the Eighth Amendment, the Equal Protection Clause and Due Process Clause of the Fourteenth Amendment, the ADA and the Rehabilitation

Act. His attempts to assign personal involvement to Corcoran, Gelsinger, Graham,[10] or Hershberger is based on their roles in Alvarez' DOC Administrative Review process or by virtue of written correspondence surrounding his claims. None of this involvement plausibly avers §1983 liability in this case. To the extent Alvarez seeks to hold each defendant responsible in his or her supervisory capacity, *see e.g.* Compl. ECF No. 1 ¶ 26 (Graham), ¶ 27 (Gelsinger), ¶¶ 123-129 (Hershberg, Corcoran), his allegations are insufficient to state a claim of supervisory liability. The case is dismissed as to them.[11]

### D. Maryland Division of Correction

Under the Eleventh Amendment to the United States Constitution, a state, its agencies and departments are immune from suits in federal court brought by its citizens or the citizens of another state, unless it consents. *See Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). While the State of Maryland has waived its sovereign immunity for certain types of cases brought in state courts, *see* Md. Code Ann., State Gov't § 12-202(a), it has not waived its immunity under the Eleventh Amendment to suit in federal court. Thus, Alvarez's claims against the Maryland Division of Correction, a state agency, are barred by the Eleventh Amendment.

### E. Sergeant Lisa Lasher

Alvarez claims that Sgt. Lasher denied his request for handicap cell accommodations ordered by physicians. ECF No. 1 at 9 ¶ 10. He does not, however, identify when he requested

---

[10] Warden Graham, who is sued in his official capacity only, attests in his declaration that medical services at WCI are provided by the private medical contractor. Declaration of Richard Graham, State Defs. Ex. ECF 24-4. Graham has no personal involvement in providing medical care to any WCI inmate nor has he hindered access to medical treatment. Graham states he has no authority to order the contractor's medical staff to perform any particular medical treatment or procedure. Graham is not licensed to practice medicine, has no responsibility under the medical contract to monitors medical services provided to inmates, and defers to the expertise of medical staff to provide medical treatment to inmates. Graham Decl. State Def. Ex. ECF No. 24-4.

[11] Dr. Baucom, however, remains as a defendant in light of Alavarez' averrments that she, as DOC Clinical Director, worked in concert with Wexford Medical Services Director, Defendant Dr. Getachew and Dr. Barrera, to deny Alvarez constitutionally adequate medical care in a deliberately indifferent manner. The Court will revisit the propriety of her status as a defendant at the close of discovery.

the handicap cell or the nature of the accommodations requested.[12]   He claims that Lasher called Janice Gilmore, the medical department supervisor, on January 27, 2015 to request the cancellation of his feed-in order because Alvarez, in Lasher's view, could walk to the dinner room for meals.  As a result, the feed-in order was rescinded.  Compl. ECF No. 1 at 44 ¶¶ 198-200.  Alvarez maintains that later "in the course of thus walking to the dinner room . . . on said Defendant Lasher's order," Lasher "negligently" caused him to walk on the ice in the prison compound and fall. Compl. ECF No. 1 at 44 ¶¶ 201, 204.[13]

In his opposition, Alvarez also asserts that Lasher retaliated against him for submitting grievances against her.  Pl. Opp. ECF No. 30-1.  However, Alvarez does not raise this claim in the Complaint and he cannot assert it in the first instance in his responsive pleadings. *See Gilmour v. Gates, McDonald & Co*., 382 F.3d 1312, 1314 (11th Cir. 2004) (emphasizing that the "liberal pleading standard" of Rule 8 "does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage"); *see also Myland Labs., Inc. v Akzo, N.V.,* 770 F. Supp. 1053, 1068 (D. Md. 1991) (stating "it is axiomatic that the complaint may not be amended by briefs in opposition to a motion to dismiss")); *see also Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), aff'd, 141 F.3d 1162 (4th Cir. 1998).

---

[12] When John Moss, PA informed Alvarez that he would be placed in housing with handrails after he completed his segregation time, Alvarez was an inmate at JCI.  Med. Defs. Ex ECF No. 17-2 at 17.

[13] Alvarez filed declarations with the Complaint from four inmates - James Tooles, #300-342, Ronald N. Jaskins, #285-369, James Calhoun-El, #160-083, and Vaun Thomas-Bay, #230-137, who attest to serious mobility issues and to denial or rescission of their disabled cell status without medical justification. Compl. Pla. Ex. ECF No. 1-5, at 1-4. Tooles, Jaskins, and Calhoun-El assert that Sgt. Lasher is responsible for rescinding their handicap cell status. Compl. Pla. Ex. ECF No. 1-5, at 1-3. To the extent that Alvarez complaint intended to raise claims on behalf of other inmates, he may not so. *Inmates v. Owens*, 561 F.2d 560, 563 (4th Cir. 1977) (stating that a self-represented party generally does not have standing to sue on behalf of others).

In any event, Sgt. Lasher, who apparently anticipated this reply, denies harassing or retaliating against Alvarez, noting that DOC employees have no authority over medical personnel or decisions. Lasher Decl., State Def. Ex. ECF No. 24-5 ¶ 4. Further, Lasher's actions were premised on observations that Alvarez was able to walk to the commissary, thereby refuting suggestions of deliberate indifference to Alvarez's medical condition. Viewing the facts alleged most favorably to Alvarez, Lasher, at most, acted negligently when she cancelled his feed-in status. Alvarez does not aver sufficient facts to suggest that Lasher acted with requisite deliberate indifference rising to the level of an Eighth Amendment claim. Accordingly, the claims are dismissed as to Lasher.

### F. Robin Woolford and Scott Oakley

Alvarez generally faults Robin Woolford, the Deputy Director of the Inmate Grievance Office (IGO) and Scott Oakley, former Executive Director of the Inmate Grievance Office,[14] for their review of his grievances and appeals regarding his medical treatment. *See e.g.* Compl. ECF No. 1 at 29 ¶¶ 133-134, at 30 ¶ 138, at 131 ¶ 139. [15]

Alvarez filed nine grievances in the Inmate Grievance Office (IGO), six of which pertain to matters relevant to his Complaint. Decl of Russell A. Neverdon, Sr. Executive Director, IGO, ECF No. 18. Of those relevant here and reviewed by the IGO, (1) IGO No. 20150647 was a grievance or "appeal" from ARP WCI-261-15, regarding Lasher transferring Alvarez from to a bottom bunk as retaliation. The grievance was administratively dismissed as moot on May 4, 2015; (2) IGO No. 2015084 was a grievance or "appeal" from ARP WCI-281-15, and

---

[14]  Service has not been obtained on Scott Oakley.  Russell A. Neverdon, Sr, is presently Executive Director of the IGO.

[15]  Alvarez also faults Defendants Corcoran, Graham, and Gelsinger for their role in reviewing ARP complaints at the Warden level. Comp. ECF No. 1 at 30 ¶¶ 137, 138. 139   For the same reasons explained above, Alvarez states no constitutional claim.

complained Alvarez's move to a top bunk and denial of feed-in status. The appeal was administratively dismissed on July 15, 2015, for failure to state a claim for which administrative relief can and should be granted; (3) IGO No. 20150998 was a grievance or "appeal" from ARP WCI-320-15, which claimed Gilmore improperly cancelled his feed-in order, caused him to walk in an icy area and slip, and he was being denied an MRI. The grievance was dismissed as outside IGO jurisdiction because it was a complaint against contract medical not DOC employees; (4) IGO No. 20152296 was a grievance or "appeal" from ARP WCI-1850-15, in which Alvarez asserted medical staff had provided false information about ARP WCI-1595-15. The IGO dismissed the claim for failure to state a claim for which administrative relief can and should be granted; (5) IGO No. 20152445, which was filed on December 24, 2015, was a grievance that alleged Dr. Getachew failed to provide Alvarez with proper treatment for his knee. The grievance was dismissed as outside IGO jurisdiction because it was a complaint against contract medical not DOC employees; (6) IGO No. 20170535 filed on April 6, 2017, was a grievance that Alvarez received inadequate medical care for his knees, including failure to schedule him for a torn meniscus repair. The grievance was dismissed as outside IGO jurisdiction because it was a complaint against contract medical personnel, not DOC employees.

"Section 1983 provides a remedy against any person who, acting under color of law, deprives another of constitutional rights." *Bixler v. Harris*, No. WDQ-12-1650, 2013 WL 2422892, at *5 (D. Md. June 3, 2013) (citing 42 U.S.C. § 1983). "Inmates have no constitutional entitlement or due process interest in access to a grievance procedure." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 541 (4th Cir. 2017) (discussing *Adams v. Rice*, 40 F.3d 72 (4th Cir. 1994)); *see Robinson v. Wexford*, No. ELH-17-1467, 2017 WL 4838785, at *3 (D. Md. Oct. 26, 2017)

("[E]ven assuming, arguendo, that defendants ... did not satisfactorily investigate or respond to plaintiff's administrative grievances, no underlying constitutional claim has been stated.").

Alvarez's claims seem grounded in his disappointment with the outcome of his grievances. But Alvarez has not stated a claim, nor marshalled evidence, to show that Woolford or Oakley are medical providers or that they had authority to direct the medical care provided to him or other inmates. Alvarez's disagreement with the outcome of his grievances does not equate with a violation of his rights to receive constitutionally adequate medical care or to due process. Accordingly, this claim will be dismissed.[16]

### G. Motion for Temporary Restraining Order or Preliminary Injunction

On January 16, 2018, Alvarez submitted a filing titled "Order to Show Cause for Preliminary Injunction and Temporary Restraining Order (ECF No. 39), for "enjoining" Drs. Getachew and Baucom to provide "a medically appropriate course of non-formulated nerve pain medicine, Neurontin/Ultram" designed to "stabilize and maintain the full function of his lower back, left hip, and left leg/knee. Motion for TRO, ECF No. 39. Alvarez also asks to be examined by an orthopedist and a neurologist to evaluate his lower back, left hip, and left leg and knee. Alvarez claims that on December 18, 2017, Janette Clark, a nurse practitioner, renewed his Neurontin. Alvarez claims that Neurontin has stabilized his chronic sciatic nerve pain in the past. He faults Baucom for issuing a "Memorandum and Order to all medical providers and the medical contractor, Wexford, to cancel all non-formulated[17]medicine, including Neurontin and Ultram. Alvarez claims that as a result, Dr. Getachew cancelled his Neurontin prescription,

---

[16]  To the extent Alvarez seeks to bring claims against the State Defendants under state law, these claims will be dismissed without prejudice.

[17]  Plaintiff may be referring to non-formulary medications.

instead prescribing psychotropic medication for him, which does not help his pain. Motion for TRO, ECF No. 39-1 at 1-2 ¶¶ 5-9.

A preliminary injunction is an "extraordinary and drastic remedy." *See Munaf v. Geren*, 553 U.S. 674, 689–90 (2008). To obtain a preliminary injunction, a movant must demonstrate: 1) that he is likely to succeed on the merits; 2) that he is likely to suffer irreparable harm in the absence of preliminary relief; 3) that the balance of equities tips in his favor; and 4) that an injunction is in the public interest. *See Winter v. Nat. Resources Def. Council, Inc*., 555 U.S. 7, 20 (2008); *The Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009), vacated on other grounds, 559 U.S. 1089 (2010), reinstated in relevant part on remand, 607 F.3d 355 (4th Cir. 2010) (per curiam). A preliminary injunction is distinguished from a temporary restraining order ("TRO") only by the difference in notice to the nonmoving party and by the duration of the injunction. *U.S. Dep't of Labor v. Wolf Run Mining Co*., 452 F.3d 275,281 n.1 (4th Cir. 2006) (comparing Fed. R. Civ. P. 65(a) with Fed. R. Civ. P. 65(b)). Alvarez' most recent motion is construed as a TRO.

Since Alvarez filed his Complaint, he appears to have received further medical treatment, including knee surgery. His requested in junctive relief in this regard seems dated, and it is not altogether clear whether follow up care has mooted Alvarez' request. The Court will revisit Alvarez' request after discovery proceeds with the assistance of counsel which the Court will appoint by separate order.

## CONCLUSION

For these reasons, the Medical Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 17) will be granted in part and denied in part. Alvarez's § 1983 claims as to Wexford and Drs. Getachew and Barrera survive, as does his claim

that Janice Gilmore denied him a handicap accessible cell in violation of his rights under the Eighth Amendment. Alvarez's other constitutional, federal and state claims against the Medical Defendants are dismissed.  The State Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment (ECF No. 24) is granted as to all but Defendant Baucom, consistent with this Opinion.  A separate Order will follow.

Also by separate Order, the Court will appoint pro bono counsel to represent Alvarez on his Eighth Amendment claims against the Medical Defendants, and thereafter a discovery scheduling order shall issue.


    3/8/18                                    /S/                    
Date                              Paula Xinis
                                  United States District Judge