## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| BRUMAN ALVAREZ, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. PX-17-00141 |
| WEXFORD HEALTH SOURCES, INC., *et al.*, | * | |
| | * | |
| Defendants. | | |

\*\*\*

## MEMORANDUM OPINION

Pending is a Motion for Summary Judgment filed by Wexford Health Sources, Inc., Asresahegn Getachew, M.D., and Robustiano Barrera, M.D.[1] ECF No. 94. Plaintiff Bruman Stalin Alvarez has opposed the motion. ECF No. 96. The motion is fully briefed, and no hearing is necessary. *See* Loc. R. 105.6. For the following reasons, the Court grants in part and denies in part Defendants' motion.

**I.   Factual Background**

Alvarez, an inmate confined at Western Correctional Institution ("WCI"), is in the custody of the Maryland Department of Public Safety and Correctional Services ("DPSCS"). ECF No. 94 ¶ 1. For much of his incarceration, Alvarez has suffered longstanding, chronic, and debilitating pain in both knees, the care for which he contends has been so mismanaged by Defendants that they have inflicted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution. *See* ECF No. 1.

Before 2014 and while incarcerated at Jessup Correctional Institute ("JCI"), Alvarez had

---

[1] On March 9, 2018, Defendants filed a Suggestion of Death for Defendant Janice Gilmore. ECF No. 43. Because Alvarez has not moved to substitute a party in her place, *see* Fed. R. Civ. P. 25(a)(1), Defendant Gilmore will be dismissed from this suit.

several surgeries on his left knee. ECF Nos. 94-1 ¶¶ 2–4; 96-1 ¶ 1. He also had surgery on his right knee for the first time in early 2014 to relieve chronic pain. ECF No. 96-3 at 67–68. That surgery was largely unsuccessful. ECF Nos. 94-1 ¶ 6; 96-1 ¶ 3.

After the 2014 surgery, orthopedic surgeon, Dr. Ashok Krishnaswamy, recommended physical therapy, a knee brace, and a cane to treat Alvarez's persisting right knee pain. ECF Nos. 94-1 ¶ 6; 96-1 ¶ 3; 96-3 at 4–5. The doctor also ordered a Magnetic Resonance Imaging ("MRI") be performed on the knee. ECF No. 96-3 at 5.

In September 2014, Alvarez was transferred from JCI to WCI where Defendants began to treat him for his chronic knee pain. ECF Nos. 94-3 at 5; 96-3 at 30. Dr. Barrera assumed primary care responsibilities for Alvarez. *See* ECF No. 96-8 at 11:7–11. Although Dr. Getachew occupied a supervisory position as Director of Utilization Management, he became directly involved in Alvarez's care. ECF Nos. 96-9 at 9:4–8; 11:16–19.

On October 13, 2014, results from the MRI of Alvarez's right knee confirmed tears to the medial and lateral menisci as well as arthritic changes. ECF No. 94-3 at 9. Dr. Barrera referred Alvarez back to Dr. Krishnaswamy for a follow-up orthopedic consultation. ECF No. 96-3 at 33. On November 18, 2014, Dr. Krishnaswamy met with Alvarez to share his findings. *Id.* at 65. Dr. Krishnaswamy concluded that Alvarez would need a right knee arthroscopy "soon" to alleviate the pain. *Id.* Dr. Krishnaswamy discussed the risks of the procedure with Alvarez, and Alvarez elected to move forward. *Id.* at 64.

Alvarez next met with Dr. Roy Carls, an orthopedic surgeon, on January 2, 2015. *Id.* at 34. Dr. Carls "strongly recommend[ed] a right knee arthroscopy" to address Alvarez's torn meniscus and arthritis. *Id.* Drs. Barrera and Getachew also discussed Dr. Carls' findings with Alvarez. *Id.* at 37. Despite Dr. Carls' recommendation, Dr. Getachew did not advocate surgery

but recommended rather that Alvarez engage in physical therapy and wear a knee brace. *Id.*

Alvarez went to physical therapy and wore the knee brace, but his pain continued. *Id.* at 38–45; ECF No. 96-8 at 142:2–20. Now a year out from the original unsuccessful surgery, Alvarez met with Dr. Carls again on June 5, 2015. ECF No. 96-3 at 47–48. Dr. Carls concluded "[s]ince [Alvarez] has not gotten better with any other non-surgical approach, the recommendation is a revision right knee arthroscopy." *Id.* at 48. Dr. Carls also noted that Alvarez had "good quadriceps strength," which pointed toward surgical success. *Id.*

After the meeting with Dr. Carls, Dr. Getachew approved Alvarez's surgery as recommended. ECF No. 96-9 at 145:21–146:1. Dr. Getachew, however, now claims that even though he approved the surgery, he "didn't feel like [it wa]s necessary" because the prior arthroscopies on both knees had been unsuccessful. *Id.* at 143:19–145:17. But, says Getachew, he approved the surgery "because the patient insist[ed]." *Id.* at 146:1. Surgery was scheduled for July 1, 2015. ECF No. 96-3 at 49.

The surgery had to be postponed, however, because Alvarez was suffering from lower back pain as a result of his degenerative disk disease. *Id.* at 50; *see also* ECF No. 94-3 at 75–76. Alvarez was concerned about his ability to tolerate knee surgery at the time and none of the Defendant physicians disagreed with Alvarez in this respect.

By August 2015, Alvarez's back pain subsided, and Dr. Barrera presented Alvarez to Dr. Getachew via telemedicine conference "for his knee problem." ECF No. 96-3 at 53. The doctors and Alvarez reviewed the findings from the October 2014 MRI. *Id.* Despite the prior recommendation and scheduled surgery, Dr. Getachew now recommended a custom knee brace and physical therapy to treat Alvarez's knee. *Id.* Nothing in the record suggests that Alvarez's knee pain had improved. Dr. Getachew also acknowledged that the custom-fit brace was ordered

to increase knee instability, but also recognized it would not "solve the pain issue." ECF No. 69-9 at 157:13–16. Dr. Barrera disagreed with Dr. Getachew's decision to order a brace instead of surgery but could not override Dr. Getachew's decision. ECF No. 96-8 at 151:5–153:15.

Although Alvarez was fitted for a carbon fiber custom knee brace a month later, the fitting was discarded. ECF Nos. 94-4 at 1; 96-3 at 70. Alvarez did not receive the brace until ten months later, on July 5, 2016.[2] ECF No. 96-3 at 69. The record is unclear as to why the fitting of a brace, purposely ordered as an interim measure to a twice recommended and once scheduled surgery, took ten months to obtain.

Predictably, Alvarez experienced little relief once he received the brace. He continued to complain of pain in both knees and described that the "right knee brace hurts and makes knee [sic] swollen." *Id.* at 20; *see also* ECF No. 94-3 at 132, 137. Alvarez resurrected his request for surgery and continued to complain of pain for nearly another year. *See* ECF Nos. 94-3 at 163; 96-3 at 20–29.

Alvarez also filed this lawsuit on January 13, 2017, alleging an array of violations arising from his delayed treatment. ECF No. 1. One month later, on February 23, 2017, Alvarez met again with Dr. Carls for the second straight year to discuss his right knee pain. ECF No. 94-3 at 167. Dr. Carls ordered an MRI and recommended that Alvarez continue quadriceps exercises and wear a knee brace. *Id*.

Alvarez waited another six weeks for the new MRI to be performed. *Id*. at 174. When asked about the propriety of this delay given Alvarez's pain and established condition, Dr. Getachew noted that Alvarez's pain "has been long-standing for many years so it was not an emergency that required this to do this [sic] soon." ECF No. 96-9 at 164:7–11.

---

[2] Alvarez was referred to Ability Prosthetics & Orthotics, which cast, re-cast, and fit his custom right knee brace. *See* ECF Nos. 94-4 at 1; 96-3 at 53, 69–70.

4

On May 25, 2017, Alvarez met Dr. Carls again to discuss the MRI results. ECF No. 94-3 at 183. The MRI showed deterioration of Alvarez's condition to include "moderate arthritic changes . . . [and] a large meniscus tear." ECF No. 96-3 at 76. Alongside Dr. Krishnaswamy's initial recommendation in late 2014, Dr. Carls recommended for the *fourth* time that Alvarez receive revision surgery on his right knee. *Id*. at 76; *see also* ECF No. 94-3 at 183. Dr. Getachew approved the surgery. ECF No. 96-9 at 166:14–16; *see also* ECF No. 94-3 at 183. When asked about whether patients generally require "four recommendations before [he] would approve a procedure from a specialist," Dr. Getachew candidly replied—"No." ECF No. 96-9 at 166:10–13. On July 14, 2017, over two-and-a-half years after the initial recommendation for Alvarez to receive surgery "soon," Alverez's right knee surgery was performed successfully. ECF No. 94-3 at 191; *see* ECF No. 96-3 at 65. Seven months later, Alvarez reported "93% improvement" in his pain. ECF No. 96-3 at 72.

Based on Alvarez's tortured path to right knee surgery, he had initially alleged a wide array of claims against Defendants. On March 8, 2018, the Court granted in part Defendants' Motion to Dismiss, leaving the Eighth Amendment claims against the individual doctors and Wexford. ECF No. 41. The Court also appointed counsel to represent Alvarez. *Id.* At the close of discovery, Defendants have moved for summary judgment on all remaining counts, which the Court now considers. ECF No. 94.

## II.     Standard of Review

Summary judgment is appropriate when the Court, viewing the evidence in the light most favorable to the non-moving party, finds no genuine disputed issue of material fact, entitling the movant to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). "A party opposing

a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)). "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003).

Importantly, "a court should not grant summary judgment 'unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances.'" *Campbell v. Hewitt, Coleman & Assocs., Inc.*, 21 F.3d 52, 55 (4th Cir. 1994) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna Casualty & Sur. Co.*, 381 F.2d 245, 249 (4th Cir. 1967)). Where the party bearing the burden of proving a claim or defense "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment against that party is likewise warranted. *Celotex*, 477 U.S. at 322.

### III. Analysis

#### A. Eighth Amendment Denial of Medical Care

The Eighth Amendment to the United States Constitution prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Setter*, 501 U.S. 294, 297 (1991)). Such protections extend to the provision of medical care. *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976).

To prove an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that defendants' acts or omissions amounted to deliberate indifference to his serious medical needs. *See id.* at 106; *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). This requires the plaintiff to show that objectively, the plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

A "serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241 (internal quotation marks and ellipses omitted). Proof of an objectively serious medical condition, however, does not end the inquiry. The subjective component requires "subjective recklessness" in the face of the serious medical condition. *Farmer*, 511 U.S. at 839–40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).

If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk known to the defendant at the time. *Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2000); *see also Jackson v. Lightsey*, 775 F.3d 170, 179 (4th Cir. 2014). That said, "negligence or malpractice on the part of

. . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones*, 145 F.3d 164, 166 (4th Cir. 1998). Adequacy of treatment must be viewed as that which "may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 47–48 (4th Cir. 1977).

Importantly, this Court has consistently held that deferral of surgery in favor of conservative treatment alone does not amount to deliberate indifference. *See Dyson v. Wexford Health Sources, Inc.*, No. TDC-19-0307, 2020 WL 1158791, at *7 (Mar. 10, 2020), *appeal filed*, No. 20-6469 (4th Cir. 2020); *Clark v. McLaughlin*, No. TDC-18-0081, 2019 WL 4142497, at *7 (D. Md. Aug. 29, 2019); *Rivera v. Wexford Health Sources, Inc.*, No. DKC-17-666, 2018 WL 2431897, at * 4 (May 30, 2018); *Dent v. Wexford Health Sources, Inc.*, No. CBB-15-206, 2017 WL 930126, at *8 (D. Md. 2017), *aff'd sub nom*, *Dent v. Ottey*, 698 F. App'x. 99 (Mem) (4th Cir. 2017); *Jennings v. Ottey*, No. WMN-14-1736, 2015 WL 4496431, at *5 (July 22, 2015), *appeal dismissed*, No. 15-7194 (4th Cir.). However, delay of treatment in the face of significant pain is the kind of harm sufficient to support a finding of deliberate indifference. *Sharpe v. S.C. Dep't of Corr.*, 621 F. App'x 732, 733–34 (Mem) (4th Cir. 2015); *see Formica v. Aylor*, 739 F. App'x 745, 755 (4th Cir. 2018) (collecting cases). With this standard in mind, the Court turns to Alvarez's claims.

**B. Alvarez' Claims**

At the heart of Alvarez's claim is the delay in surgery as a necessary medical procedure to alleviate his pain. The parties do not dispute that Alvarez's chronic and painful knee condition rose to the level of a serious medical need. Nor is there much dispute that initially, Defendants responded timely and appropriately to address his pain. After Dr. Krishnaswamy

8

recommended surgery "soon" in late 2014, both Drs. Getachew and Barrera agreed to attempt a conservative course of treatment first, including physical therapy and use of a brace. ECF No. 96-3 at 37. Then, when conservative treatment failed, Dr. Getachew approved Alvarez for surgery in June 2015 and it was scheduled soon after. *Id.* at 49. The record until this point, viewed most favorably to Alvarez, simply does not support that any claimed failure to address Alvarez's serious medical need amounts to deliberate indifference.

However, Alvarez continued to suffer two years more, not undergoing the necessary surgery until July 2017. He had complied with all conservative treatment prescribed, to no avail. Accordingly, both Drs. Carls and Barrera concluded that surgery remained Alvarez's only real option to alleviate his pain. ECF Nos. 96-3 at 34; 96-8 at 140:14–142:1, 153:1–2.

Against this backdrop, Alvarez could not procure a necessary surgery and received little palliative care in the interim. The Court, therefore, must examine the record as to Alvarez's course of care from August 2015 until July 2017 to determine if a genuine dispute of material fact exists as to whether such denial amounts to deliberate indifference. The Court considers the evidence against each defendant separately.

### i. Dr. Getachew

Alvarez principally challenges Dr. Getachew's decision to opt, again, for more conservative treatment between August 2015 and July 2017. Alvarez contends that Dr. Getachew refused to schedule his surgery after his back pain subsided in August 2015 because it was too costly and had previously been approved in "error." ECF Nos. 1 ¶ 55; 96 at 20–21; 98-1 ¶ 39. Defendants respond that they were attentive to Alvarez's medical condition because he was seen by medical staff on 56 occasions between 2015 and 2017. ECF No. 94-2 at 9–10. Defendants also emphasize that surgery was delayed because Alvarez chose to postpone it. *Id.* at

6. Finally, Defendants counter that Dr. Getachew's response to Alvarez's condition with more conservative treatment was reasonable. *Id.* The record, however, belies that summary judgment is warranted as to Dr. Getachew.

Plainly, the 56 medical visits cut both ways. Although Dr. Getachew presses that the visits reflect timely and appropriate care, Alvarez rightly emphasizes that the visits underscore his persistent pain, instability, lack of response to conservative treatment, and excessive delay on authorizing the surgery. The record further reflects that Alvarez's back issues may have caused a brief delay in the surgery but cannot explain why Dr. Getachew persisted in further delay until July 2017 and in light of Alvarez's worsening condition. *See* ECF Nos. 96-3 at 13 (requesting a handicapped cell on December 4, 2015 because his "knees [we]re giving out and being [sic] falling"); 96-3 at 15 (requesting a handicapped cell again because he was "subjected to falling because [his] knees [we]re giving out more often"); 96-3 at 16 ("request[ing] right knee surgery" on February 9, 2016); 96-3 at 9 (requesting "on-site orthopedic consult [on April 27, 2016] for chronic knee pain and dislocation . . . [because his] knees [were] giving out and [were] very painful when standing for [a] long time"); 96-3 at 20 (requesting right knee surgery again on July 22, 2016).

On this record, a trier of fact could conclude that Dr. Getachew's delay in approving Alvarez's surgery exhibited a reckless disregard for Alvarez's serious and painful condition. Dr. Getachew provided no rational explanation for failing to schedule Alvarez for surgery after his back pain subsided. Dr. Getachew also conceded that customarily an inmate does not need *four* separate specialist recommendations for necessary surgery before the inmate receives it. ECF No. 96-9 at 166:10–13. Nor did Dr. Getachew deny that throughout, he knew Alvarez was in pain. In fact, to Dr. Getachew, Alvarez's long-term suffering appeared to be grounds to

10

postpone, rather than expedite surgery—no "emergency" existed, according to Dr. Getachew, because Alvarez had been living with such pain for years. ECF No. 96-9 at 164:7–11. These facts support that Dr. Getachew was keenly aware the surgery was Alvarez's only real means of even a chance at pain relief, and yet the provision of such treatment was delayed for at least eighteen months.[3]

Dr. Getachew, in response, emphasizes that continued conservative treatment was a reasonable alternative. Record evidence says otherwise. Dr. Getachew conceded that meniscal tears, the source of Alvarez's pain, could not be repaired short of surgery. *Id*. at 129:19–130:5. Dr. Getachew also admitted that a knee brace quite likely will not alleviate pain or treat the underlying cause for it. *Id*. at 139:19–22; *see also id.* at 157:13–16 ("[A] knee brace is not going to solve the pain issue. It is to improve mobility and function . . . . It helps but it is not the solution."). Yet Dr. Getachew delayed Alvarez's surgery *ten additional months* to supply Alvarez with a brace that the doctor knew would not alleviate the pain. A jury could conclude Getachew's response was unreasonable.[4] ECF Nos. 94-4 at 1; 96-3 at 69–70; 96-9 at 156:18–157:7; 94-3 at 92, 139; 96-3 at 34, 37, 45, 53, 65; *cf. Dent*, 2017 WL 930126, *1–*5 (finding evidence of recklessly or intentionally delayed medical care that prolongs pain is sufficient to demonstrate deliberate indifference). Summary judgment as to Dr. Getachew is therefore denied.[5]

---

[3] The record reflects that as of August 2015, Alvarez's back pain had sufficiently resolved, but certainly at the latest, Alvarez expressly requested surgery on February 9, 2016. ECF No. 96-3 at 16. After his request, Alvarez waited nearly eighteen additional months before receiving the surgery on July 14, 2017. ECF No. 94-3 at 191.

[4] Although the record supports that the delay was due to an administrative hold up in approving a custom orthotic, *see, e.g.*, ECF No. 94-3 at 98, 109, it is undisputed that Alvarez remained in pain for the duration. Indeed, even Dr. Barrera acknowledged Alvarez should not have waited almost a year to receive the brace. ECF No. 96-8 at 177:5–178:6.

[5] Defendants obliquely challenge Alvarez's expert, Dr. David Mathis, on his qualifications to opine on the reasonableness of Dr. Getachew's response. ECF No. 101 at 8. To the extent the Court ultimately finds that Dr. Mathis cannot render such an opinion, summary judgment must still be denied based on the strength of several

### ii.     Dr. Barrera

Dr. Barrera compels a different outcome. Although it is beyond dispute that Dr. Barrera, as Alvarez's treating physician, knew of his chronic pain, *see, e.g.*, ECF No. 96-3 at 31, 35, 37, 45, 53, 55, no evidence supports that the doctor acted with deliberate indifference. After the first course of conservative treatment failed, Dr. Barrera joined in the chorus of physicians recommending surgery. He also disagreed with Dr. Getachew's decision to deny surgery in favor of a custom fitted brace. ECF No. 96-8 at 131:1–3, 153:1–2. Dr. Barrera, unlike Dr. Getachew however, could not approve the surgery. *Id.* at 51:4–20, 53:21–54:1; *see also* ECF Nos. 94-3 at 49, 92, 127, 139, 182, 222; 96-3 at 52; 96-9 at 9:11–16, 145:21–146:1, 166:14–16, 166:22. But it is clear that Dr. Barrera did what he could within the confines of his position to treat Alvarez's condition. *See* ECF No. 96-8 at 34:21–37:17. On this record, no reasonable trier of fact could conclude that Dr. Barrera acted with deliberate indifference to Alvarez's serious medical need. *See Quinones*, 145 F.3d at 166.

Alvarez, in evident recognition that the claims against Dr. Barrera are far weaker, emphasizes that Dr. Barrera contributed to a delay in surgery between January and March 2015, and denied Alvarez's request to be placed in a specially-equipped cell while waiting for his custom knee brace. ECF No. 96 at 19–20; *see* ECF No. 96-8 at 125:18–126:3. During the few months in early 2015, however, Alvarez was still attempting conservative treatment short of surgery, which this Court has already determined cannot form the basis for his deliberate indifference claim. *Cf. Dyson*, 2020 WL 1158791, at *7; *Clark*, 2019 WL 4142497, at *7;

---

treating physicians who repeatedly recommended that Alvarez receive the surgery as of June 2015. ECF Nos. 96-3 at 47–48; 96-8 at 140:5–141:13; 96-9 at 145:21–146:1. Second, as for Dr. Mathis—a proffered expert in the field of emergency medicine, primary care, and correctional medical care to include orthopedics—he appears similarly situated to Dr. Getachew who also is not an orthopedic surgeon. *See* ECF No. 96-10 at 5–6, 33. In any event, Defendants have not formally moved to strike Dr. Mathis as an expert and so the Court need not, and cannot, decide this issue here.

*Rivera*, 2018 WL 2431897, at * 4; *Dent*, 2017 WL 930126, at *8; *Jennings*, 2015 WL 4496431, at *5. As for the denial of a specially-equipped cell, the record reflects that Dr. Barrera opted to have Alvarez "try to use the knee brace first." ECF No. 96-3 at 55. Alvarez has marshaled no evidence to suggest this decision was unreasonable or otherwise amounts to deliberate indifference. Accordingly, summary judgment is granted in Dr. Barrera's favor.

### iii. *Monell* Claims Against Wexford

Likewise, claims against Wexford also fail on this record because no evidence reflects that "Wexford maintains any unconstitutional policies or customs." ECF No. 102 at 1. As this Court discussed at length in its earlier opinion, if liability attaches to Wexford at all, it must be based on the corporation assuming the role of state actor and employing an unconstitutional "custom, policy, or practice by which local officials violate a plaintiff's constitutional rights." *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 402 (4th Cir. 2014); *see Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978); *see also Haughie v. Wexford Health Sources, Inc.*, No. ELH-18-3963, 2020 WL 1158568, at *15 (D. Md. Mar. 9, 2020) (citing *Rodriguez v. Smithfield Packing Co., Inc.*, 338 F.3d 348, 355 (4th Cir. 2003)) (holding that private companies standing in shoes of a state actor are subject to *Monell* liability). Accordingly, claims against Wexford may only proceed if record evidence supports that "its policy or custom . . . is (1) fairly attributable to the [corporation] as its 'own,' . . . and is (2) the 'moving force' behind the particular constitutional violation." *Spell v. McDaniel*, 824 F.2d 1380, 1386–87 (4th Cir. 1987) (citation omitted).

Assuming Alvarez could demonstrate that Wexford functioned as a state actor, he has generated no evidence that Wexford implemented an unconstitutional policy or practice. Instead, Alvarez relies almost exclusively on Dr. Getachew's failure to follow obligations set forth in

Wexford's contract with DPSCS, and broadly avers that the decisions made while treating Alvarez in his supervisory role are established Wexford "customs." *See* ECF No. 98 at 10–12. Alvarez also avers, without proof, that "Wexford's cost-saving and administrative convenience policies perpetuated the ongoing denial of [his] medical care." *Id*. at 10. But the record evidence, considered most favorably to Alvarez, simply does not make out any unconstitutional policy, practice, or custom which lead to the alleged constitutional violations. Contrary to Alverez's arguments, the Wexford contract documents do not support the inference that Alvarez was denied necessary surgery solely to save money and without regard to medical necessity. *See* ECF Nos. 96-4; 96-5; 96-6; 99-6. At best, the record reflects that Dr. Getachew exercised his individual discretion to deny the surgery, not because he was following an unconstitutional policy. Summary judgment is granted on claims against Wexford.[6]

## IV. Conclusion

For the foregoing reasons, Defendants Motion for Summary Judgment is granted as to Dr. Barrera and Wexford and denied as to Dr. Getachew. A separate Order follows.

5/18/2020  
Date

/S/  
Paula Xinis  
United States District Judge

---

[6] Alvarez also asks the Court to impose appropriate sanctions for Wexford's destruction of relevant emails once Wexford no longer provided medical services to DPSCS. *See* ECF No. 96 at 24–29. The Defendants respond, essentially, that Wexford preserved all documents relevant to Alvarez's care and produced them in discovery. *See* ECF No. 101 at 11–13. On this record, the Court cannot conclude that any relevant evidence has been destroyed. Nor does Plaintiff proffer how the missing evidence particularly would alter the outcome of this motion. That said, should Alvarez wish to pursue the spoliation argument *in limine* at trial, he may do so.